IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAUL B.,[1]

        Plaintiff,

        v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        Defendant.

Case No. 6:24-cv-01057-JR

OPINION AND ORDER

RUSSO, Magistrate Judge:

      Plaintiff Paul B. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Title II Disability Insurance Benefits under the Social Security Act. All parties have consented to allow a Magistrate Judge enter final orders and judgement in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is affirmed, and this case is dismissed.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

Page 1 – OPINION AND ORDER

## BACKGROUND[2]

Born in August 1971, plaintiff alleges disability beginning January 15, 2020, due to "sleep apnea, asthma, heart conditions, back issues, worsening vision and speech, anxiety, [and] depression." Tr. 434, 453. His application was denied initially and upon reconsideration. On October 3, 2023, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did a vocational expert ("VE"). Tr. 239-68. On December 28, 2023, the ALJ issued a decision finding plaintiff not disabled. Tr. 293-05. After the Appeals Council denied his request for review, plaintiff filed a complaint in this Court.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date. Tr. 295. At step two, the ALJ determined the following impairments were medically determinable and severe: "cardiomyopathy and secondary pulmonary hypertension/heart failure; cervical stenosis with radiculopathy; lumbar degenerative disc disease with radiculopathy; asthma; and obesity." *Id.* At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 297.

Because he did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected his ability to work. The ALJ resolved that plaintiff had the residual function capacity ("RFC") to perform "less than the full range of light work" as defined in 20 C.F.R. § 404.1567(b):

> He can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. He can sit, stand, and walk for six hours in a typical eight-hour workday.

---

[2] The record before the Court is more than 1700 pages, but with multiple incidences of duplication. Where evidence occurs in the record more than once, the Court will generally cite to the transcript pages on which that information first appears in its entirety.

Page 2 – OPINION AND ORDER

> He can push and pull as much as he can lift and carry. He can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. He can frequently stoop, kneel, and crouch. He can occasionally crawl. He cannot work at unprotected heights or operate moving mechanical parts. He can tolerate occasional, concentrated exposure to atmospheric conditions as defined in the Selected Characteristics of Occupations of the Dictionary of Occupational Titles. He cannot handle objects that vibrate. He cannot work in weather, humidity, wetness, extreme cold, or extreme heat.

Tr. 298.

At step four, the ALJ determined plaintiff was capable of performing past relevant work as a health club manager. Tr. 303. The ALJ alternatively concluded, at step five, that there were a significant number of jobs in the national economy plaintiff could perform despite his impairments, such as collator operator, routing clerk, and mail clerk.[3] Tr. 303-04.

## DISCUSSION

Plaintiff argues the ALJ erred by: (1) improperly assessing the medical opinion of Hugh Henderson, M.D.; (2) discrediting his subjective symptom statements; and (3) implicitly rejecting the lay testimony of his spouse.

**I.    Medical Opinion Evidence**

Plaintiff first argues the ALJ improperly rejected Dr. Henderson's medical opinion. Where, as here, the plaintiff's application is filed on or after March 27, 2017, the ALJ is no longer tasked with "weighing" medical opinions, but rather must determine which are most "persuasive." 20 C.F.R. § 404.1520c(a)-(b). "To that end, there is no longer any inherent extra weight given to the opinions of treating physicians . . . the ALJ considers the 'supportability' and 'consistency' of the

---

[3] The VE testified that these representative occupations could still be performed with a limitation to "frequent bilateral fingering." Tr. 263. In addition, the VE identified three sedentary exertion positions that were otherwise consistent with the dispositive hypothetical. Tr. 264-65. He indicated that a significant number of the sedentary and light exertion jobs at issue could also be performed with a "sit/stand option at will." Tr. 265-66.

Page 3 – OPINION AND ORDER

opinions, followed by additional sub-factors, in determining how persuasive the opinions are." *Kevin R. H. v. Saul*, 2021 WL 4330860, *4 (D. Or. Sept. 23, 2021). The ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" and "explain how [they] considered the supportability and consistency factors." *Id.* At a minimum, "this appears to necessitate that an ALJ specifically account for the legitimate factors of supportability and consistency in addressing the persuasiveness of a medical opinion." *Id.*

Plaintiff initiated mental health treatment with Dr. Henderson in July 2021. Tr. 675, 1568. The record contains eleven related chart notes, with the last occurring on August 1, 2023. Tr. 1649.

On August 4, 2023, Dr. Henderson completed a form prepared by plaintiff's attorney, in which he indicated seeing plaintiff "every 3 months" for "medical management." Tr. 1568-69. In the section requesting medical signs and symptoms, Dr. Henderson wrote: "generalized anxiety disorder, major depression, chronic cervical pain due to multiple cervical disc [issues] causing major problems ambulating with falls recently occurring." Tr. 1569. He stated these symptoms prevented plaintiff from "work[ing] with the public" or "show[ing] up to work due to panic attacks."[4] *Id.* The doctor also opined plaintiff "has some difficulty performing difficult tasks like tracking his medications etc. Wife is in charge of meds." *Id.* Dr. Henderson concluded that plaintiff could not perform simple, routine, non-public work because "he is limited by his mental disorders as well as physical disorders in even getting to work on a regular basis." *Id.*

---

[4] As discussed herein, Dr. Henderson's chart notes themselves do not make any reference to panic attacks. In fact, there are only two references in the 1700-plus page record to panic attacks – and those are both from a different provider. *See* Tr. 1660, 1674 (Rajeev Rajendra, M.D., noting in January and April 2023 that plaintiff had access to "alprazolam [to take] as needed for panic attacks"). It appears as though plaintiff was prescribed Alprazolam for further treatment of his anxiety symptoms in August 2022. Tr. 27, 1657, 1683, 1691, 1705, 1724.

Page 4 – OPINION AND ORDER

In a corresponding "Medical Source Statement of Ability to do Work-Related Activities (Mental)," Dr. Henderson checked boxes evincing plaintiff would have moderate problems: making judgments on simple work-related decisions, responding appropriately to usual work situations and changes in a routine work setting, and interacting appropriately with supervisors, co-workers, and the public. Tr. 1571. He also opined plaintiff was markedly limited in his ability to: understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions.[5] *Id.* In support of the aforementioned limitations, Dr. Henderson wrote "major depression," "cervical disc compression," and "panic symptoms . . . reduce his ability to function." *Id.*; *see also* Tr. 1572 (citing plaintiff's "social phobia which keeps him at home where he feels safe" and "severe cervical disc disorders" as the factors that support his assessment).

The ALJ found Dr. Henderson's opinion "not . . . persuasive, as it is not supported by Dr. Henderson's own treatment record or the balance of the evidence." Tr. 302-03. Additionally, the ALJ denoted plaintiff "has not required any specialist mental healthcare and generally has unremarkable mental status exams," and "treatment notes indicate [his] anxiety is largely controlled with medication." Tr. 303.

The Court finds the ALJ properly considered the supportability and consistency of Dr. Henderson's opinion. An ALJ may find a medical opinion unpersuasive where the provider's opinion is inconsistent with their own chart notes. *Stiffler v. O'Malley*, 102 F.4th 1102, 1107 (9th Cir. 2024). Similarly, inconsistency with the medical record is a valid reason to find a medical

---

[5] This form defined "moderate" as "more than a slight limitation [but] still able to function satisfactorily," and "marked" as a "serious limitation [with] a substantial loss in the ability to effectively function." Tr. 1570.

Page 5 – OPINION AND ORDER

opinion unpersuasive. *See, e.g.*, *Hahn v. Berryhill*, 722 Fed.Appx. 602, 605 (9th Cir. 2017); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

An independent review of the record demonstrates that plaintiff first presented to Dr. Henderson in July 2021 because "his mood has become more depressed [and anxious] over this past year [due to his] medical problems." Tr. 675. Dr. Henderson noted plaintiff had been "placed . . . on Lexapro 1 year ago [by another provider] and he got some benefit in mood and decreased irritability," but "has been off alcohol 1 month and [is] coping with urges."[6] *Id.* Plaintiff was observed to be labile, frustrated, and depressed, with an impaired remote memory. Tr. 677. Dr. Henderson re-filled plaintiff's prescription for Lexapro and started him on Hydroxyzine for anxiety. Tr. 678.

At their next appointment in August 2021, plaintiff "report[ed] that he has been depressed and continues to be markedly anxious when venturing out of the home." Tr. 679-80. Plaintiff mentioned that "[h]e occupies himself during the day by taking care of his two sons" and "go[es] to the river swimming," but "is having to stay inside due to the poor air quality." Tr. 680. Dr. Henderson recommended counseling; plaintiff declined, explaining he "does not think he needs to talk to a therapist presently." *Id.* Dr. Henderson noted plaintiff's anxiety was "mildly elevated" and increased his Hydroxyzine dose, as well as introduced Wellbutrin. Tr. 682-83.

When plaintiff returned to Dr. Henderson in September 2021, he was "doing much better with respect to mood and interest in doing things":

> He's become more active and is planning on doing some weight training now that the boys are back in school. He is less irritable and overall less anxious on current medication regime . . . he is feeling less depressed and more motivated. He has not

---

[6] Plaintiff drank heavily through 2019. *See, e.g.*, Tr. 165, 753. Although he subsequently reduced his consumption, he continued to struggle with alcohol until stopping entirely in 2021. Tr. 21, 165, 645, 663, 1223.

contracted Covid and is isolating himself from others and using a mask when having contact socially. He does not feel the need to have a therapist at this point.

Tr. 684-85. Dr. Henderson observed: "Less anxious overall. Mood is improved. Affect is brighter. He is initiating conversation more readily. He is future goal-directed." Tr. 687. Plaintiff was therefore instructed to continue on his current medication regime. *Id.*

The following month, plaintiff again told Dr. Henderson "that his mood is less depressed," but "he gets some increased anxiety in the afternoon." Tr. 1321-22. Plaintiff relayed:

> He is in the process of working with one other person with body building. He is trying to get more clients. He's been isolating himself primarily at home and rarely goes to the store. He's been able to stay Covid free. He related that a 32 year old friend contracted covid and died this past week. He continues to take care of his two sons. It's a little easier now that they're back to school. He doesn't feel the need to see a therapist at this point.

Tr. 1322. The doctor instructed plaintiff to increase his Hydroxyzine to include "one in midafternoon dose to decrease his anxiety." *Id.*

In November 2021, plaintiff reported to Dr. Henderson:

> [H]is sleep pattern is much improved over the last three weeks. He also thinks his mood has been improved and he has been more active with respect to care for his two boys. He is sleeping 7 -8 hours a night. He is tolerating the [Wellbutrin] in the morning well with no side effects. His social anxiety is slightly improved. He only has one pupil for weightlifting training. He's hoping to get more after the holidays. His overall outlook has improved.

Tr. 1332-33. Dr. Henderson wrote: "His anxiety level is mildly elevated. He is future goal-directed. His thinking is logical and intact." Tr. 1335. Plaintiff was continued on his current medications and told to follow-up in two months. *Id.*

In January 2022, plaintiff "[r]eport[ed] that his mood has been quite stable" and he continued "to feel some benefit with respect to energy level and is more future goal-directed," with less anxiety. Tr. 1340-41. Plaintiff had "been occupying himself at night by working crossword puzzles and working out with weights during the day," and was "coping well with the children

having gone back to school this week" and "relieved that his spouse has gotten employment and they will have health insurance." *Id.*

In May 2022, plaintiff told Dr. Henderson that "his mood had been fairly good," although he had stress associated with a recent move and crowds. Tr. 1479-80. Dr. Henderson noted plaintiff's "[a]nxiety is elevated," but with no associated neurological or psychiatric findings. Tr. 1482.

Plaintiff was experiencing essentially the same degree of symptoms during his next appointment in November 2022, although he indicated "doing well" in his marriage, and that he was "responsible for getting the kids to school and home" and then providing "structure to get their homework done." Tr. 1682-83. Dr. Henderson wrote that plaintiff's "[a]nxiety level is lower and his] [m]ood is only mildly dysphoric." Tr. 1685.

In February 2023, plaintiff's mood was "quite stable" and his anxiety was "under fairly good control on current medication." Tr. 1668. He remarked he and his spouse were "getting into a routine now with school and childcare" following their move, and that "[h]e's been helping his dad with simple errands like picking up prescriptions and doctors' appointments." *Id.*

In May 2023, plaintiff told Dr. Henderson:

> [H]e's been doing fairly well with respect to his mood. He has not made any changes in his medication regime. He continues to use his CPAP machine on a nightly basis with good results . . . He continues to get his two sons off to school in the morning and works with them when they come home after school. He has maintained some lifting schedule to keep his muscles toned . . . He does not feel the need to be working with a therapist at this point.

Tr. 1654-55. Plaintiff's cognitive functioning, mood, behavior, and affect were observed to be normal, despite his "anxiety level [being] mildly elevated." Tr. 1657.

The last chart note from Dr. Henderson largely focused on plaintiff's worsening cervical spine issues. Tr. 1649-50. Plaintiff nonetheless reported that "his sleep is fairly organized" and

Page 8 – OPINION AND ORDER

"[h]e has been caring for his two sons during the summer [while his] wife is working full time at a health facility." Tr. 1650. Dr. Henderson noted plaintiff's "[a]nxiety level is moderately elevated . . . regarding [his] need for a cervical operative procedure." Tr. 1652.

Thus, while his symptoms waxed and waned to a certain degree, plaintiff overall experienced improvement in his psychological conditions with medication – such that he felt no need for counseling – and was able to engage in a number of physical and mental activities both inside and outside the home despite some lingering anxiety (which appears to have been at least partially related to situations stressors, including the COVID-19 pandemic).

Other portions of the record lend further support to the ALJ's decision. For instance, the records from other providers are consistent with Dr. Henderson's chart notes. *See* Tr. 651, 664 (plaintiff reporting in February and April 2020 that his mood/irritability had improved with Lexapro and he was drinking less), 1152, 1157 (February and August 2020 mental status examinations revealing no depression, anxiety, or agitation); *see also* Tr. 1375, 1703, 1712, 1722 (other providers observing normal mood and behavior in October 2021, August 2022, May 2023, and September 2023).

Moreover, plaintiff's own statements in his "Adult Function Report" and at the hearing bely Dr. Henderson's opinion. Notably, in September 2021, both plaintiff and his spouse reported no depression or anxiety, and no problems with concentration, following written and spoken instructions, or getting along with authority figures, family, friends, neighbors, or others. Tr. 463-70, 483-90. They also clarified that plaintiff's spouse prepared his "pill boxes [because] he cannot read the bottles to know when or how many to take" due to poor vision, but "[i]f he can read it, then it's not a problem." Tr. 465-68, 485. And, as described in Section II, plaintiff testified that his physical impairments restricted his ability and desire to leave the house. Relatedly, the Court notes

Page 9 – OPINION AND ORDER

that Dr. Henderson's assessed limitations appear to be at least partially related to plaintiff's spinal/pain issues, as opposed to the mental health conditions for which he was treating plaintiff. The ALJ's decision is upheld as to this issue.

## II.     Plaintiff's Testimony

Plaintiff next contends the ALJ erred by discrediting his testimony concerning the extent of his physical impairments.[7] When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (internal citation omitted). A general assertion the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). In other words, the "clear and convincing" standard requires an ALJ to "show [their] work." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022).

---

[7] Plaintiff also briefly asserts the ALJ "failed to consider the alleged severity and limiting effects of [his] mental disorders" because "the record documents [he] had to isolate at home to limit environmental stressors." Pl.'s Opening Br. 10 (doc. 11). Yet, as discussed herein, plaintiff's hearing testimony focused on his physical impairments and, by extension, so did the ALJ's analysis. Regardless, any error in regard to this issue is harmless given the ALJ's discussion in relation to Dr. Henderson's opinion. *See Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (mistakes that are "non-prejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion" are harmless); *see also Kaufmann v. Kijakazi*, 32 F.4th 843, 851 (9th Cir. 2022) (the reviewing court must look "to all the pages of an ALJ's decision" when evaluating the claimant's subjective symptom testimony).

Page 10 – OPINION AND ORDER

Thus, in formulating the RFC, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness, and instead assesses whether the claimant's subjective symptom statements are consistent with the record as a whole. SSR 16-3p, *available at* 2017 WL 5180304. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted). The question is not whether the ALJ's rationale convinces the court, but whether the ALJ's rationale "is clear enough that it has the power to convince." *Smartt*, 53 F.4th at 499.

At the hearing, plaintiff testified that he stopped working in January 2020 due to a cardiac event that landed him the hospital for a few days, and thereafter required him to avoid lifting more than 50 pounds and wear a life-vest for three months. Tr. 246-47. Plaintiff stated he had not been to the gym[8] or received physical therapy or injections for his back since his January 2020 hospitalization. Tr. 248, 252-53. However, he had neck surgery scheduled for December 2023, which was intended to address many of his pain symptoms. Tr. 249. Plaintiff indicated that his spinal problems were chronic and had persisted since well before the alleged onset date. Tr. 251-52. When the ALJ noted that this impairment "wasn't preventing you from working," plaintiff responded: "Well, I'd have to lean up against something all the time and I had to do a little thing at a time." Tr. 252. Plaintiff also endorsed longstanding hand problems that have "gotten worse" and prevented him from writing and grabbing/holding onto objects. Tr. 254.

As far as daily activities, plaintiff denied engaging in any weightlifting or exercising at home, except isometric exercises done while seated on the couch. Tr. 250. He also denied engaging

---

[8] Plaintiff previously worked as a personal trainer; the record reflects that at least some of his medical issues are tied to his long-term use of body-building supplements. *See, e.g.*, Tr. 247, 594, 670.

Page 11 – OPINION AND ORDER

in any household chores or grocery shopping. Tr. 255-56. He specified that he "stay[s] home a lot" because his physical impairments make it difficult: "Every time I try to get out, I got to sit or walk from here to there and I got to sit down real quick . . . Sometimes I can't hardly sit straight up [or breath properly]." Tr. 256, 258. In terms of functional abilities, plaintiff stated that, since the alleged onset date, he can sit or stand for five minutes at a time and must constantly shift positions (even once seated). Tr. 251, 253, 257.

In terms of mental symptoms, plaintiff testified his medications did not help. Tr. 257. The only other testimony plaintiff proffered surrounding his mental health was as follows:

> I'm in a bad mood and I just get down on everything . . . I don't like to be around nobody and so I pull my hair out. Sometimes it's stressful. So I can't, I can't work out and do the stuff I used to and it's just – that's hard to change, you know. You're going from working out all the time and then I do stuff, I'm sitting on the couch, you know. And not being able to help my family do anything.

*Id.*

After summarizing the hearing testimony, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce some degree of symptoms, but his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 299. The ALJ specifically cited to plaintiff's activities of daily living, treatment history, and the objective medical record. Tr. 299-301.

Concerning the ALJ's first rationale, "[e]ven where [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (superseded by statute on other grounds). Substantial evidence supports the ALJ's decision in this regard.

Page 12 – OPINION AND ORDER

Notably, there are myriad references in the record reflecting that plaintiff's physical abilities exceeded the limitations he articulated at the hearing. For instance, in September 2021, plaintiff's spouse reported he prepares simple meals, watches television, and cares for their children daily (i.e., 6 and 8 years old as of the alleged onset date); folds clothes, waters plants, helps with the dishes, and does "band workouts" weekly; and shops in stores monthly. Tr. 464-67, 470, 828. She also did not endorse any problems with plaintiff using his hands or lifting below 50 pounds. Tr. 467-68. Similarly, plaintiff indicated preparing simple meals, doing light chores, grocery and thrift shopping, watching television, and caring for his two young children for several hours per day while his spouse was at work. Tr. 484-87. Plaintiff also reported "camping 2-3 times per year" and the ability to lift up to 50 pounds. Tr. 487-88, 490.

As addressed in Section I, the record also reflects that plaintiff was an active caregiver to his children and regularly engaged in exercise. Consistent with Dr. Henderson, other providers noted that plaintiff rode his bike, worked out at home, and walked for exercise, and played with his children. *See, e.g.*, Tr. 640, 837, 1223, 1239, 1243, 1260, 1327, 1558; *see also* Tr. 670 (March 2021 primary care chart note reflecting that plaintiff "is still active in the gym but lifting less heavy and increasing cardio"), 1156 (August 2020 pulmonology chart note indicating plaintiff "rides his bicycle regularly to stay active"), 1485 (May 2022 cardiology chart note showing that plaintiff "does 20 mins of isometric exercise and plays with the kids without cp/sob/doe"), 1558 (April 2023 cardiology chart notes denoting plaintiff "is still exercising with bands and isometric exercises . . . he mowed the lawn this weekend and is active around the house without cp/sob/doe").[9] The ALJ reasonably inferred from the aforementioned activities that plaintiff's

---

[9] The record does indicate that, leading up to his December 2023 surgery, plaintiff's spinal pain began to worsen and he became progressively less active. *See, e.g.*, Tr. 1524, 1550, 1660, 1691. The main references in the record to plaintiff dropping objects or needing to support himself while

Page 13 – OPINION AND ORDER

physical functional abilities were greater than alleged. *See Febach v. Colvin*, 580 Fed.Appx. 530, 531 (9th Cir. 2014) (ALJ is not required to accept a claimant's attempt to characterize activities as consistent with disability where those activities "could also reasonably suggest" greater functional abilities) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004)).

Turning to the ALJ's remaining rationales, "whether the alleged symptoms are consistent with the medical evidence" is a relevant consideration. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007). Relatedly, the failure to follow prescribed treatment is a legitimate reason to reject a claimant's subjective symptom testimony. *Trevizo v. Berryhill*, 871 F.3d 664, 680 (9th Cir. 2017).

As the ALJ accurately observed, plaintiff's cardiac and pulmonary symptoms improved throughout the adjudication period. Tr. 299-301. For instance, plaintiff's ejection fraction – which is a measure of the amount of blood that is pumped out of the heart – was 30-35% in January 2020. Tr. 1512. However, his ejection fraction "improved to 50-55%" (i.e., a normal range) by March 2020. And by January 2022 plaintiff's ejection fraction was 60-65%. Tr. 1518. Likewise, he experienced "marked improvement" with light-headedness once he eliminated a certain medication and began eating more than one meal per day. Tr. 1512, 1519. Although he had an abnormal EKG in November 2021, his providers repeatedly noted thereafter that he was "active without cardiac symptoms, which . . . is reassuring." Tr. 1353, 169, 1492, 1353, 1565.

Finally, immediately following his January 2020 hospitalization, plaintiff's providers recommended on numerous occasions that he undergo an ablation procedure to help treat his heart conditions. *See, e.g.*, Tr. 653, 786-87, 823, 1243. Plaintiff "never followed up," indicating that he

---

ambulating are from within this period. *Compare* Tr. 1617, 1647, *with* Tr. 1623, 1660; *see also* Tr. 1544, 1635, 1646. The post-surgical evidence reflects that plaintiff experienced "excellent improvement of his preoperative symptoms," despite some initial complications. Tr. 200.

preferred to "wait until covid is over . . . He is unvaccinated." Tr. 169, 1239, 1268, 1421. In April 2023, plaintiff's cardiologist "again reviewed the referral . . . to follow-up with EP to discuss ablation." Tr. 1565. Plaintiff stated was "not interested in EP referral at this point" and instead "would like to continue his rate control strategy." *Id.* Plaintiff's cardiologist agreed that "it's not unreasonable to continue his current regimen" given "that he has done well for about 3 years now without recurrence." *Id.*

In sum, because the ALJ cited at least one legally sufficient reason, supported by substantial evidence, his decision is affirmed as to plaintiff's subjective symptom testimony. *See Batson*, 359 F.3d at 1197 (ALJ's evaluation of the claimant's subjective symptom testimony may be upheld even if all the reasons proffered are not valid).

**III.    Lay Testimony**

Plaintiff lastly asserts the ALJ "erred in rejecting the lay testimony [of his spouse] without comment." Pl.'s Opening Br. 11-13 (doc. 11). "Lay testimony as to a claimant's symptoms is competent evidence that the [Commissioner] must take into account." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citation omitted). For initial applications filed after March 27, 2017, the ALJ is not "required to articulate how [they] considered evidence from nonmedical sources" using the same criteria required for the evaluation of medical sources. 20 C.F.R. § 404.1520c(d). The ALJ must nonetheless articulate their assessment of lay witness statements under the new regulations.[10] *Tanya L.L. v. Comm'r Soc. Sec.*, 526 F.Supp.3d 858, 869 (D. Or. 2021).

---

[10] Citing the revised regulations and the Ninth Circuit's unpublished opinions in *Fryer v. Kijakazi*, 2022 WL 17958630 (9th Cir. Dec. 27, 2022), and *Kennedy v. O'Malley*, 2024 WL 242992 (9th Cir. Jan. 23, 2024), the Commissioner argues the ALJ is no longer required to provide "germane reasons" for discounting lay witness testimony. Def.'s Resp. Br. 12-13 (doc. 14). This issue appears to be currently under consideration in the Ninth Circuit. *See Hudnall v. Dudek*, 130 F.4th 668, 671 (9th Cir. March 7, 2025), *vacated and withdrawn*, 2025 WL 1024393, *1 (9th Cir. Apr. 7, 2025). "Unless and until the Ninth Circuit provides contrary, binding guidance on the

Here, plaintiff is correct that the ALJ did not expressly discuss the lay witness statements. This error was nonetheless harmless given that plaintiff and his spouse's statements regarding his limitations were substantially similar. *Compare* Tr. 463-70, *with* Tr. 483-90; *see also De Mello v. Kijakazi*, 2022 WL 17583054, *1 (9th Cir. Dec. 12, 2022) (affirming the ALJ's rejection of lay testimony where it "did not describe any limitations beyond those [the claimant] himself described, which the ALJ rejected based on well-supported, clear and convincing reasons") (citing *Molina*, 674 F.3d at 1122); *Sievers v. Berryhill*, 734 Fed.Appx. 467, 470-71 (9th Cir. 2018) (ALJ's error in evaluating the lay witness testimony was harmless because the lay "statements described the same limitations as [the claimant's] own testimony," explaining "[t]he ALJ's reasons for rejecting [the claimant's] statements apply with equal force to the lay testimony") (citation and internal quotations omitted).

## CONCLUSION

For the reasons stated above, the Commissioner's decision is AFFIRMED and this case is DISMISSED.

IT IS SO ORDERED.

DATED this 9th day of May, 2025.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge

---

interpretation of the 2017 regulations, [this District will] continue to require ALJs to state a germane reason for disregarding lay witness testimony." *Sarah H. v. Comm'r Soc. Sec. Admin.*, 2025 WL 1305800, *7 n.4 (D. Or. May 6, 2025) (citation omitted).

Page 16 – OPINION AND ORDER